IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| COAL RIVER MOUNTAIN WATCH<br>P.O. Box 651<br>Whitesville, WV 25209 | ) |
| | ) |
| | ) |
| KENTUCKIANS FOR THE COMMONWEALTH<br>P.O. Box 1450<br>London, Ky. 40743 | ) |
| | ) |
| | ) |
| KENTUCKY WATERWAYS ALLIANCE<br>107 E. Court St.<br>Greensburg, KY 42743 | ) |
| | ) |
| | ) |
| OHIO VALLEY ENVIRONMENTAL COALITION<br>P.O. Box 6753<br>Huntington, WV 25773-6753 | )  No. 1:08-cv-02212-BJR |
| | ) |
| SAVE OUR CUMBERLAND MOUNTAINS<br>P.O. Box 479<br>Lake City, TN   37769 | ) |
| | ) |
| | ) |
| SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA  94105 | ) |
| | ) |
| | ) |
| SOUTHERN APPALACHIAN MOUNTAIN STEWARDS<br>511 Main Street<br>Appalachia, Virginia  24216 | ) |
| | ) |
| | ) |
| WATERKEEPER ALLIANCE<br>17 Battery Place Suite 1329<br>New York, New York  10004 | )  **COMPLAINT FOR**<br>)  **DECLARATORY AND**<br>)  **INJUNCTIVE RELIEF** |
| | ) |
| WEST VIRGINIA HIGHLANDS CONSERVANCY<br>HC 78 Box 227<br>Rock Cave WV 26234 | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) |
| | ) |
| S.M.R. JEWELL, Secretary of the United States<br>Department of the Interior<br>1849 C Street, NW, Washington, D.C.  20240, | ) |
| | ) |
| BOB PERCIASEPE,  Acting Administrator of the<br>United States Environmental Protection Agency<br>Ariel Rios Bldg., 1200 Pennsylvania Av., NW<br>Washington, D.C.  20460, | ) |
| | ) |
| Defendants | ) |

## AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### Introduction

1.      This action seeks review of a final rule promulgated by the Office of Surface

Mining ("OSM") for "Excess Spoil, Coal Mine Waste, and Buffers for Perennial and Intermittent

Streams," 73 Fed. Reg. 75,814 (Dec. 12, 2008) ("stream buffer zone rule" or "SBZ rule"), and

the concurrence determination of the United States Environmental Protection Agency ("EPA")

allowing OSM's final rule to be promulgated, issued on December 2, 2008.

### JURISDICTION AND VENUE

2.      This action arises under the Surface Mining Control and Reclamation Act, 30

U.S.C. § 1201 *et seq*. ("SMCRA"), the Clean Water Act, 33 U.S.C. § 1251 *et seq*. ("CWA"), the

National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. ("NEPA"), and the Administrative

Procedure Act, 5 U.S.C. § 700 *et seq*. ("APA").  This Court has jurisdiction over this action

pursuant to 30 U.S.C. § 1276(a)(1) and 28 U.S.C. § 1331.  Venue in this Court is proper under 30

U.S.C. § 1276(a)(1), 28 U.S.C. § 1391(e), and 5 U.S.C. § 703.

### PARTIES

3.      Coal River Mountain Watch ("CRMW") is a nonprofit membership organization

located in southern West Virginia with approximately 500 members, most residing in West

Virginia.  CRMW works on behalf of its members to stop destructive mining practices, improve

the quality of life in the southern West Virginia region, and rebuild sustainable communities.

4.      Kentuckians for the Commonwealth ("KFTC") is a nonprofit membership

corporation that is organized under the laws of Kentucky, with its main office in London, Laurel

County, Kentucky, and has approximately 6,500 members statewide.  KFTC's purposes include

promoting social, economic, and environmental justice for all Kentuckians, in part by addressing

problems caused by coal mining and its effects on the water, air, land and people of Kentucky. KFTC members will suffer injuries to their interests from stream filling and disturbances related to mining activities that are authorized because of the 2008 SBZ Rule.

5.      Kentucky Waterways Alliance ("KWA") is a nonprofit alliance of individuals, government representatives, industry members, and community organizations, whose mission is to protect and restore Kentucky's waterways.  Since 1991, KWA has worked to develop and implement strategies to address issues facing Kentucky streams, rivers, lakes and wetlands.

6.      Ohio Valley Environmental Coalition ("OVEC") is a nonprofit organization incorporated in Ohio.  Its principal place of business is in Huntington, West Virginia.  Most of OVEC's approximately 1,000 members reside in West Virginia, Kentucky, and Ohio, with other members located in Indiana, Washington, D.C., New York, North Carolina, Pennsylvania, Tennessee and Virginia.  Its mission is to organize and maintain a diverse membership dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development and media outreach.

7.      Save Our Cumberland Mountains ("SOCM") is a thirty-six year-old grassroots citizens' organization with more than 2,000 members in Tennessee working for environmental, social, and economic justice. SOCM grew out of the coalfields in East Tennessee and is dedicated to giving its members a voice in the quality of life in their communities. Many of SOCM's members live, work, and recreate in the Elk Valley community and the areas surrounding Zeb Mountain, where surface coal mining operations are presently occurring.

8.      The Sierra Club is a national nonprofit organization of approximately 1.3 million members and supporters dedicated to exploring, enjoying, and protecting the wild places of the earth, practicing and promoting the responsible use of the earth's ecosystems and resources, to

educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.  It has approximately 1,900 members who reside in West Virginia and belong to its West Virginia Chapter, over 5,000 members who reside in Kentucky and belong to its Kentucky Chapter, over 6,800 members who reside in Tennessee and belong to its Tennessee Chapter, and over 16,800 members who reside in Virginia and belong to its Virginia Chapter.  The Club's concerns encompass the exploration, enjoyment and protection of surface waters in West Virginia, Kentucky, Tennessee and Virginia.

9.      Southern Appalachian Mountain Stewards ("SAMS") is an organization of concerned community members, whose headquarters is located in Appalachia, Virginia.  SAMS and its allies work to stop environmental damage and the destruction of communities by surface coal mining, to improve the quality of life, and to help rebuild sustainable communities in the southern Appalachian region.

10.      Waterkeeper Alliance, a corporation organized and existing under the laws of the State of  New York, is an umbrella organization representing and protecting the interests of over 180 Riverkeeper, Baykeeper, Coastkeeper, Soundkeeper and other Waterkeeper programs in North America and around the world.  Waterkeeper also supports and connects its community-based membership conservation programs and provides a voice for its over 15,000 individual members nationwide, who use, and recreate and otherwise depend on local waterways, and the fish that live in them.  The mission of the Waterkeeper Alliance involves protecting its members' commercial, recreational, aesthetic and conservation interests in clean and accessible waterways. Any activity that would compromise the health and vitality of these waterways would cause significant harm to the interests of its members.

11.     West Virginia Highlands Conservancy ("WVHC") is a nonprofit membership organization located in West Virginia.  Established in 1967, WVHC is one of the state's oldest environmental advocacy organizations and for the past three decades has been a leader in citizen efforts to protect West Virginia's land and water resources from the effects of illegal coal mining. Its headquarters is located in Charleston, West Virginia, and most of its approximately 1,800 members reside in West Virginia.

12.     Plaintiffs' members will suffer injuries to their aesthetic, recreational, environmental and/or economic interests by stream filling and disturbances related to mining activities that are authorized pursuant to the SBZ rule in West Virginia, Kentucky, Tennessee, and Virginia if the rule is allowed to stand.  These activities drastically change the landscape, eliminate large sections of forests, fill miles of streams, and pollute downstream waters. Plaintiffs' members live, recreate, flyover, use, and/or enjoy the natural and human environment near these areas.  Their use and enjoyment of these areas is reduced by these mining activities.

13.     Defendant Dirk Kempthorne is the Secretary of the Interior.  He has the authority under Section 501(b) of SMCRA to issue rules for surface coal mining activities.  Acting through the Office of Surface Mining, the Secretary is charged by § 201 of SMCRA with administering the programs that are required by SMCRA for controlling surface coal mining operations.

14.     Defendant Stephen Johnson is the Administrator of EPA.  He has the authority under Section 501(b) of SMCRA to concur or not concur with rules proposed by the Secretary of the Interior.

## FACTS

15.     OSM first issued the SBZ rule in 1979 and revised it in 1983.  44 Fed. Reg. 14,902 (Mar. 13, 1979); 48 Fed. Reg. 30,312 (June 30, 1983).  The 1983 rule provided that '[n]o

land within 100 feet of a perennial stream or an intermittent stream shall be disturbed by surface mining activities, unless the regulatory authority specifically authorizes surface mining activities closer to, or through, such a stream."  48 Fed. Reg. at 30,312 (citing 30 C.F.R. § 816.57).  The rule further provided that the regulatory authority may authorize such activities only upon finding that surface mining activities will not cause or contribute to violation of applicable State or Federal water quality standards, and will not adversely affect water quantity and quality or other environmental resources of the stream.  *Id.* at 30,314 (citing 30 C.F.R. § 816.57).

16.     On December 12, 2008, OSM issued a final rule changing the SBZ rule in several major respects. 73 Fed. Reg. 75,814 (Dec. 12, 2008).  In particular, the new rule exempts valley fills and other stream-filling activities associated with surface coal mining activities from the scope of the rule, and eliminates the requirement that OSM determine that such activities do not cause or contribute to violations of water quality standards under the CWA.  This rule is scheduled to become effective on January 12, 2009.

## GENERAL ALLEGATIONS

**A.     The SBZ Rule Violates Environmental Protection Standards Established by SMCRA for Excess Spoil Disposal.**

17.     Through SMCRA, Congress charged OSM with "the establishment of appropriate standards to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public." 30 U.S.C. §§ 1201(d), 1211(c).  SMCRA establishes "strong spoil disposal standards" governing disposal of excess rock "overburden" produced by surface coal mining, commonly referred to as "spoil."  Pursuant to those standards, surface mining operations may be authorized only if the permitting authority ensures that such operations comply with various requirements, including: that the mining operations will "minimize disturbances and adverse impacts . . . on fish, wildlife, and related environmental values," 30

U.S.C. §§ 1265(b)(24); that "no damage will be done to natural watercourses", *id*. § 1265(c)(4)(D); that the excess spoil will be placed in an area that "does not contain springs, natural water courses or wet weather seeps unless lateral drains are constructed from the wet areas to the main underdrains in such a manner that filtration of the water into the spoil will be prevented," *id*. § 1265(b)(22)(D); and that the disposal "is compatible with the natural drainage patterns and surroundings," *Id*. § 1265(b)(22)(G).

18.     SMCRA mandates that mining operations must "minimize the disturbances to the prevailing hydrologic balance <u>at the mine-site and in associated offsite areas</u>."  *Id*. § 1265(b)(10) (emphasis added).  By specifying that mining disturbances such as valley fills should minimize environmental harm "at the mine-site," Congress expressed its intent to protect streams where the disturbances occur, *i.e.*, in the footprint of proposed valley fills and any stream segments proposed to be used for mining waste disposal or treatment.  By specifying that mining disturbances should minimize environmental harm "in associated offsite areas," Congress expressed its intent to protect affected downstream areas.

19.     The stream buffer zone rule was originally enacted to implement SMCRA's environmental protection standards.  OSM adopted the original SBZ rule based upon the agency's determination that a 100-foot buffer to guard streams from surface mining and reclamation activities was "<u>required to protect streams</u> from the adverse effects of sedimentation and <u>from gross disturbance of stream channels</u>."  44 Fed. Reg. at 15,176 (emphasis added).

20.     In the preamble to its new rule, OSM acknowledges that the original stream buffer requirement was designed to implement SMCRA's performance standards for environmental protection, set forth at 30 U.S.C. §§ 515(b)(10) (requiring operators to "minimize the disturbances to the prevailing hydrologic balance" on- and off-site, and disturbances "to the

quality and quantity of water in surface and ground water" both during and after mining), and 515(b)(24) (requiring operators to "minimize disturbances and adverse impacts of the operation on fish, wildlife, and related environmental values, and achieve enhancement of such resources where practicable").  *See* 73 Fed. Reg. at 75,816.

21.     SMCRA provides that nothing in that Act shall be construed as superseding or repealing the CWA.  30 U.S.C. § 1292(a).  In addition, under § 501 of SMCRA, Congress mandated that OSM shall not promulgate regulations for surface coal mining and reclamation operations until it has obtained the written concurrence of the Administrator of the EPA with respect to potential conflicts with air or water quality standards promulgated under the Clean Water Act or Clean Air Act.  *Id.* § 1251(b) (incorporating § 1251(a) by reference).

**B.     The SBZ Rule Reverses Prior Agency Interpretation and Policy Regarding the Buffer Requirement, Without a Rational Explanation or Evidentiary Basis**

22.     The prior stream buffer rule applied to the entire stream, and not only to land adjacent to streams:

> Sec. 816.57  Hydrologic balance: Stream buffer zones.
> (a) No land within 100 feet of a perennial stream or an intermittent stream shall be disturbed by surface mining activities, unless the regulatory authority specifically authorizes surface mining activities closer to, or through, such a stream. The regulatory authority may authorize such activities only upon finding that-- (1) Surface mining activities will not cause or contribute to the violation of applicable State or Federal water quality standards, <u>and will not adversely affect the water quantity and quality or other environmental resources of the stream;</u>

30 C.F.R. §§ 816.57(a)(1), 817.57(a)(1) (emphasis added).

23.     When it enacted this provision, OSM recognized that "Section 816.57 protects stream channels," and that  "[§] 816.57 establishes the kinds of streams [that require] <u>direct protective measures.</u>"  44 Fed. Reg. at 15,176, 15,177.  Thus, OSM determined that applying the rule to protect stream segments from being filled advances the purpose of the environmental

protection standards under SMCRA, which were promulgated "to ensure that all surface mining activities are conducted in a manner which preserves and enhances environmental and other values in accordance with the Act."  *See id*. at 15,137, 15,396; 30 C.F.R. § 816.2.

24.     When it promulgated the original regulation, OSM did not exempt valley fills or other waste disposal practices from the buffer requirement.  *See* 44 Fed. Reg. 15,176–78 (discussing stream buffer zones); *id*. at 15,204–08 discussing disposal of excess spoil in valley fills, head-of-hollow fills, and durable rock fills.

25.     Consistent with OSM's findings in support of the original SBZ rule, in his 1999 ruling interpreting that rule, Judge Haden, Chief Judge of the District Court for the Southern District of West Virginia, ruled that "[n]othing in the statute, the federal or state buffer zone regulations, or the agency language promulgating the federal regulations suggests that portions of existing streams may be destroyed so long as (some other portion of) the stream is saved." *Bragg v. Robertson*, 72 F. Supp. 2d 642, 651 (S.D. W. Va. 1999) (reversed on grounds unrelated to the merits).  While Judge Haden's ruling was overturned on jurisdictional grounds, the substance of his ruling was not addressed by the Court of Appeals.  *See Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001).

26.     In the preamble to the final revised rule, OSM asserts that "[h]istorically, we and the State regulatory authorities have applied the 1983 stream buffer zone rule in a manner that allowed the placement of excess spoil fills . . . in intermittent and perennial streams." 73 Fed. Reg. at 75,817.  This assertion is incorrect.

27.     In fact, OSM, EPA and the Corps expressly agreed with Judge Haden's interpretation of the SBZ rule.  In their brief on appeal in *Bragg*, the agencies stated:

> [Judge Haden] correctly found that SMCRA's stream buffer zone rule . . .
> prohibits the burial of substantial portions of intermittent and perennial streams

> beneath excess mining spoil. The elimination of substantial intermittent or
> perennial stream segment [sic] necessarily causes adverse environmental effects,
> as it eliminates all aquatic life that inhabits those stream segments. As the district
> court rightly concluded, the elimination of entire stream segments and all the life
> they contain plainly causes environmental harm. Accordingly, the district court
> correctly granted summary judgment on plaintiffs' buffer zone claims.

Brief for the Federal Appellants at 2, Bragg v. W. Va. Coal Ass'n, 248 F.3d 275 (4th Cir. 2001)

(No. 99-2683). OSM, EPA and the Corps determined that the prior SBZ rule protected stream

segments, and that valley fills could only be permitted upon the required finding that they would

not adversely affect streams. These agencies stated that the District Court correctly held:

> [T]hat valley fills in intermittent or perennial streams may be authorized under the
> buffer zone rule only if the permitting agency finds that they will not adversely
> affect the environmental resources of the filled stream segments. WVDEP has
> acknowledged that it has routinely approved valley fills in intermittent and
> perennial streams without making the findings called for by the buffer zone rule
> for the stream segment filled. The district court correctly rejected the arguments
> that WVDEP was not required to make the buffer zone findings, holding that the
> findings required by the buffer zone rule must be made for the filled stream
> segments and not at some point downstream from the valley fills; and (2) findings
> made by the Corps under the CWA section 404(b)(1) guidelines are not a
> substitute for the buffer zone findings.
> The district court also correctly. . .[held]. . .that the burial of substantial portions
> of intermittent or perennial streams in valley fills causes adverse environmental
> impact in the filled stream segments and therefore cannot be authorized consistent
> with the buffer zone rule. The uncontested evidence demonstrates that the burial
> of substantial portions of intermittent or perennial [sic] causes adverse
> environmental effects to the filled stream segments, as such fills eliminate all
> aquatic life that inhabited those segments.

Id. at 24-25 (emphasis added). These agencies further stated, "valley fills that disturb intermittent

or perennial streams may be approved only if there is a finding that activity will not adversely

affect the environmental resources of the filled stream segment." Id. at 41 (emphasis added).

28.     In a May 22, 2000 letter, Acting OSM Director Kathrine Henry adopted the same

position that "the stream buffer zone waiver findings must be made not only for segments

downstream of the fill, but also for each segment of an intermittent or perennial stream in which

excess spoil is placed."  In its 2004 proposed rule, OSM admitted that the agencies' brief in the

*Bragg* litigation and the Acting Director's 2000 letter took the position that the rule applied to

valley fills. *Proposed Rule*, 69 Fed. Reg. 1036, 1040 (Jan. 7, 2004).

29.     In contrast to the contemporaneous preamble to the rule and subsequent

interpretations by OSM, EPA and the Corps, the new buffer zone rule expressly excludes "excess

spoil fills and coal mine waste disposal facilities in a perennial or intermittent stream" from the

buffer requirement.  73 Fed. Reg. at 75,883.  Neither OSM nor EPA has offered a reasoned

explanation or evidence to support this change in this position.

30.     Moreover, in an additional reversal of the agency's prior policy, the new rule

states that findings made by the Corps in its CWA § 404 permitting process, *see* 33 U.S.C. §

1344, would now serve as an adequate substitute for OSM's or the state permitting authority's

own required findings under the original buffer zone rule.  *See* 73 Fed. Reg. at 75,857

(discussing revised 30 C.F.R. § 816.57(a)(2)).  This is the approach that OSM, EPA and the

Corps previously declared to be <u>inadequate</u> to protect streams.  *See* Brief for the Federal

Appellants, (No. 99-2683), *supra*, at 24-25 ("findings made by the Corps under the CWA section

404(b)(1) guidelines are not a substitute for the buffer zone findings").  Neither EPA nor OSM

offers a reasoned explanation or evidentiary basis for this about-face.

**C.     OSM failed to Analyze a Range of Available Alternatives to the New SBZ Rule,
Including Alternatives that OSM, EPA and the Corps Had Previously Studied.**

31.     SMCRA provides that the "adoption of regulations under section 501(b) shall

constitute a major federal action" under NEPA. 30 U.S.C. § 1292(d).  OSM cited section 501(b)

as the authority for issuing its revision of the buffer zone rule. 69 Fed. Reg. at 1037.  The

preamble to the final rule serves as OSM's "Record of Decision" concerning the agency's

Environmental Impact Statement ("EIS") required by NEPA.  73 Fed. Reg. at 75,870.

32.     NEPA requires OSM to consider "alternatives to the proposed action." 42 U.S.C.

§ 4332(C)(iii).  Under regulations for implementing NEPA, "[t]his section is the heart of the

environmental impact statement." 40 C.F.R. § 1502.14.  It requires that OSM "[r]igorously

explore and objectively evaluate all reasonable alternatives, and for alternatives which were

eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id*.

33.     Each of the alternatives OSM considered, including its "no action" alternative,

allow mining and spoil disposal in the SBZ without restrictions on fill size, volume, location, or

other factors central to SMCRA's environmental standards.  Environmental Impact Statement,

Excess Spoil Minimization, Stream Buffer Zones, OSM-EIS-34, Bk. I at II-18 to II-23 (Sept.

2008), *released* Oct. 17, 2008 ("Final EIS").

34.     OSM's "no action" alternative simply stated that OSM "would not adopt any new

or revised rules.  The current regulations applicable to excess spoil generation, coal mine waste

disposal, fill construction, and stream buffer zones would remain unchanged." 73 Fed. Reg. at

75,870.  In defending this definition of the "no action" alternative, OSM repeated the fiction that

"neither OSM nor the State SMCRA regulatory authorities have applied or interpreted the stream

buffer zone rule as an absolute prohibition on the construction of excess spoil fills . . . when

those activities inherently must be conducted in the stream." *Id*. at 75,817 and 75,882.  This "no

action" alternative therefore embodies OSM's past failure to enforce the rule as it was written

and previously interpreted by the agency.

35.     Critically, OSM failed to consider various alternatives that would involve

maintaining the existing SBZ rule and enforcing a 100-foot buffer, or specifying restrictions for

stream fills.  As a result, OSM never studied the environmental benefits that would result from

maintaining the SBZ rule and enforcing it as OSM and EPA interpreted it in the *Bragg* litigation.

12

*Compare* Brief for the Federal Appellants, 4th Cir., No. 99-2683, *supra*, *with* 73 Fed. Reg. at

75,870; Final EIS at II-19 (discussing OSM's "no action alternative").  Moreover, OSM failed to

provide a reasoned basis for its refusal to consider such alternatives.

36.     OSM summarily rejected alternatives that would restrict stream fills.  Such

alternatives would restrict fills by type of stream (ephemeral, intermediate or perennial), fill size

(area or volume), watershed size (from 35 to 640 acres), stream length (200 to 2000 linear feet),

or the percentage of streams filled in a watershed.  *See* Final EIS at II-23-34.  Instead,

misconstruing these alternatives as "effectively prohibit[ing] excess spoil fills" (*see*, *e.g.*, *id*. at

II-26), OSM dismissed these alternatives as infeasible or beyond the agency's authority.  *Id*. at

II-23 to II-33.  Consequently, OSM failed to consider environmental benefits associated with

imposing any restrictions on stream fills.

37.     In the Final EIS, OSM erroneously assumed that, without additional scientific

information, <u>no</u> restrictions on stream fills are possible or appropriate.  *See*, *e.g.*, Final EIS at II-

30 ("OSM has identified no sound scientific basis for restricting the size of excess spoil fills");

and *id*. at II-31 ("no scientific basis for establishing such a 'bright line' watershed size

threshold").  This determination was arbitrary and unlawful in light of conclusive evidence

before the agency that demonstrates violations of water quality standards and other serious

environmental degradation caused by stream fills and other mining activities within the SBZ, and

further demonstrates that maintaining buffer zones in and within 100 feet from streams would

eliminate or ameliorate those adverse impacts.  Moreover, the excuse of inconclusive evidence is

not a sufficient basis for eliminating alternatives from analysis under NEPA.

38.     OSM's refusal to consider a range of alternatives cannot be reconciled with the

fact that the agency in fact has previously considered fill-restricting alternatives, particularly in

preliminary drafts of the Programmatic EIS on mountaintop mining/valley fills ("PEIS"),

prepared jointly during 2001–2002 by OSM, EPA and the U.S. Army Corps of Engineers.

Early documents relating to the PEIS identified alternatives that retained the SBZ rule and

restricted stream fills to ephemeral or intermittent streams, acknowledging the direct relationship

between fill size and environmental impacts.  For example a March 2002 draft said that "[d]irect

loss of streams and stream impairment" was central to the agencies' early identification of

available alternatives, and that because of "the importance of allowable valley fill size to mine

viability and environmental impacts, the agencies developed the EIS alternatives around it."

39.     OSM's final rule and related EIS disregard available alternatives that would

restrict stream fills.  This omission was arbitrary, contravened the agencies' responsibilities

under SMCRA and the CWA to protect the environment, and violated NEPA.

**D.     OSM Relies on Unsupported Claims of the Environmental Benefits of the SBZ Rule, in Violation of NEPA and the APA.**

40.     OSM overstated the benefits of its new rule, in violation of NEPA, 42 U.S.C. §

4332(C)(i), and the APA, 5 U.S.C. § 706.  In its discussion of the environmental effects of the

alternatives it considered, OSM acknowledged that the beneficial impact of the new rule "would

be limited by the changes already made by . . . states" in their own SMCRA programs.  73 Fed.

Reg. at 75,875.  Further, OSM acknowledged that it does not anticipate any "major on-the-

ground consequences because [it does] not expect those revisions would alter the rate at which

surface coal mining and reclamation operations are impacting perennial and intermittent

streams."  *Id.*  OSM acknowledged, without further discussion, that "miles of stream directly

impacted by excess spoil fills for permits issued between 1985 and 2001 is 724 miles . . . . If fill

construction continued at this rate, an additional 724 miles of headwater streams would be buried

in the next 17 years (by 2018)."  *Id.*  Thus, OSM acknowledged that each alternative it

considered would allow stream burial and water quality degradation to continue at current rates.

Indeed, this would be the impact of OSM's continued failure to enforce the 1983 SBZ rule.

41.     In the face of this acknowledgment, the agency reached the baseless conclusion

that its chosen alternative, Alternative 1, "would positively impact the environment." *Id*. at

75,875.  OSM provides no support for that conclusion, and instead offers its own self-serving

assertion that Alternative 1 "incorporates changes to reduce the adverse impacts of coal mine

waste disposal facilities. . . . on fish, wildlife, and related environmental values," namely the

requirement that the permit applicant "minimize the volume of excess spoil to the extent

possible" and "[m]inimize disturbances to and adverse impacts on fish, wildlife, and related

environmental values to the extent possible." *Id*. at 75,885.  However, these requirements are

merely redundant of existing requirements under SMCRA to "minimize disturbances and

adverse impacts . . . on fish, wildlife, and related environmental values," 30 U.S.C. §§

1265(b)(24), and under the CWA § 404(b)(1) Guidelines to take "appropriate and practicable

steps" that "will minimize potential adverse impacts of the discharge [of dredged or fill material]

on the aquatic ecosystem," 40 C.F.R. § 230.10(d).  OSM therefore cannot credit the new SBZ

Rule's minimization requirement as a positive impact on the environment.

42.     OSM offers no evidentiary basis for its conclusion that these redundant

requirements create positive impacts on the environment, or any indication of how the rule will

serve this goal.  In fact, its conclusion runs directly counter to available scientific evidence.

**E.     OSM and EPA Ignored the Likely Individual and Cumulative Water Quality
        Impacts of Valley Fills and Other Waste Disposal Practices, in Violation of SMCRA,
        NEPA, and the CWA.**

43.     With respect to water quality, OSM's final rule and EPA's concurrence

determination erroneously focus on procedural aspects of the SMCRA and CWA permitting

programs.  In doing so, the agencies unlawfully ignored the real-world impacts upon water quality of allowing mining spoil to be dumped in stream fills, and the substantive statutory and regulatory requirements binding their actions.

44.     As OSM and EPA acknowledged in 2000, "the burial of substantial portions of intermittent or perennial streams in valley fills causes adverse environmental impact in the filled stream segments. . . ."  Brief for the Federal Appellants, 4th Cir., No. 99-2683, p. 2.  As Judge Haden pointed out in his decision on the merits of that case, "[v]alley fills are waste disposal projects so enormous that, rather than the stream assimilating the waste, the waste assimilates the stream.  The Court holds that placement of valley fills in intermittent and perennial streams violates federal and state water quality standards by eliminating the buried stream segments for the primary purpose of waste assimilation."  *Id*. at 662.  Moreover with valley fills, "[t]his concentration of industrial waste is mortal to animal or aquatic life in the stream segment buried. Existing stream uses are not protected, but destroyed. These effects are inconsistent with State and federal water quality standards."  *Id*. at 663.

45.     Neither OSM nor EPA acknowledged or confronted evidence of damage to streams caused by spoil disposal and other mining disturbances in the SBZ.  Among others, studies conducted for the Programmatic EIS and a recent long-term monitoring study by EPA staff show numerous impacts upon streams in mined watersheds.  The proposed rule would allow permittees to conduct mining operations and dump mine waste within the stream buffer zone. Neither agency attempted to explain how the final rule would protect against the cumulative impacts of allowing continued stream destruction without limitations.

46.     A recent in-depth monitoring study by EPA staff clearly shows that coal mining operations in these southern West Virginia watersheds are "strongly related to downstream

biological impairment," including diminished biodiversity that otherwise characterizes unmined

Appalachian streams, and pronounced adverse effects on stream chemistry. Gregory J. Pond et

al., Downstream Effects of Mountaintop Coal Mining: Comparing Biological Conditions Using

Family- and Genus-Level Macroinvertebrate Bioassessment Tools, 27 J. N. AM. BENTHOL.

SOC'Y, 717-37 (July 8, 2008). The study demonstrated numerous adverse aquatic impacts that

result from coal mining operations.  For example:

    a.  "Our finding that entire orders of benthic organisms (e.g. Ephemeroptera) were nearly

        eliminated in [mountaintop removal mining] streams is a cause for concern and is

        evidence that the aquatic life use is being impaired."

    b.  "Downstream of [mountaintop removal mining] sites, specific conductance and

        component ions can be elevated 20 to 30x over the background observed at unmined

        sites."  This is significant because "[e]levated conductivity can be toxic through

        effects on osmoregulation" in aquatic insects.

47.     In addition, a study by the  Kentucky Department for Environmental Protection

entitled "Effects of Surface Mining and Residential Land Use on Headwater Stream Biotic

Integrity in the Eastern Kentucky Coalfield Region," pg. 38 (July 2004) identified "conductivity

as a primary stressor of concern."  This study found that "the long-term impacts to these

headwater streams cause problems for re-colonization by indigenous macroinvertebrate

communities."  *Id*. at 39.  In addition, the study noted that "high chemical loading of dissolved

solids may persist for centuries, as crushed overburden weathers in hollowfills."  *Id*.

48.     These studies echo similar findings in reports prepared for the 2002 Programmatic

EIS.  *See*, *e.g.*, "A Survey of Water Quality of Streams in the Primary Region of Mountaintop /

Valley Fill Coal Mining, October 1999 to January 2001, pg. 24-61 (April 8, 2002).

49.     OSM and EPA failed to offer a reasoned explanation how the SBZ rule would address these cumulative adverse impacts of burying streams in mining waste.

**F.    EPA's Concurrence in the SBZ Rule Is Unlawful Under SMCRA and Contrary to EPA's Authority Under the CWA.**

50.     Section 501 of SMCRA provides that regulations on environmental protection standards cannot be approved by OSM unless it has "obtained the written concurrence" of EPA "with respect to those aspects" of federal regulations "which relate to air or water quality standards promulgated under the" Clean Water Act and the Clean Air Act.  30 U.S.C. § 1251(b).

51.     The CWA constrains EPA's authority to issue a concurrence for the SBZ rule. Moreover, the language of § 501 of SMCRA and the history of that provision make clear that, in enacting the concurrence requirement, Congress intended that SMCRA rules be held to a higher standard than mere procedural consistency with CWA permitting procedures.

52.     Congress enacted the EPA concurrence requirement in SMCRA because it was concerned that OSM might attempt to promulgate regulations that create a risk of conflict with the CWA, including but not limited to water quality standards.  Congress concluded that the EPA concurrence requirement was necessary to prevent environmental harm due to such a conflict. As stated in a 1977 House Report on the concurrence requirement, "the requirement for the Secretary of the Interior to obtain the concurrence of the Administrator of the Environmental Protection Agency is necessary to insure that any environmental requirement of this act is consistent with the environmental programs and authorities of EPA . . . ."  This report stated further that "it is imperative that maximum coordination be required and that any risk of duplication or conflict be minimized."  H. R. Rep. No. 218, 95th Cong., 1st Sess. 142 (1977) (emphasis added).  Thus, EPA could not concur with the final rule if it were inconsistent with or presented "any risk" of conflict with Clean Water Act requirements.

53.     EPA's fundamental duty is to administer the CWA so as to achieve the objectives of that Act.  These include: restoring and maintaining the chemical, physical, and biological integrity of the Nation's waters; eliminating the discharge of pollutants into waters of the United States; establishing water quality standards in order to protect the propagation of fish, shellfish, and wildlife and providing for recreation in and on the waters; and developing and implementing technologies necessary to control pollution and eliminate the discharge of pollutants into waters. *See* 33 U.S.C. § 1251(a), (d); *see also*, *e.g.*, 40 C.F.R. § 230.10(b)-(c) (antidegradation requirements); *id*. § 131.5 (governing EPA review of state-proposed water quality standards).

54.     Constrained by the statutory and regulatory framework of the CWA from which it receives its authority to act with respect to protecting the nation's waters, EPA has no authority or discretion to approve a SMCRA regulation that would create permanent, irreparable harm to streams.  Given the stream degradation and water quality impacts discussed above, EPA could not lawfully concur in the rule as written by OSM because it is inconsistent with the CWA and its framework.  Therefore, by concurring in the rule EPA violated its duty to protect waters from pollution and ensure achievement of other objectives of CWA.

**G.     EPA's Concurrence In the SBZ Rule Violated the Requirement for Public Notice and Opportunity for Comment Under the APA.**

55.     EPA's concurrence in the SBZ rule is itself a rule as defined under the APA, and therefore EPA was required by the APA to provide notice and opportunity to comment on its concurrence determination.  5 U.S.C. § 553.

56.     Because OSM could not promulgate the rule without EPA's approval under 30 U.S.C. § 1251, EPA's concurrence constituted a final agency action regarding a rule of general applicability by which rights will be determined and legal consequences will flow.

57.     EPA failed to provide the public with any notice or opportunity to review its proposed standard for concurrence in the SBZ rule and basis for that determination.  Because EPA took action without the benefit of public comments and without publicly responding to comments, this omission resulted in prejudice to Plaintiffs and the public.

58.     EPA's concurrence determination does not fall within any of the exceptions for public notice and comment requirements.  This omission violated Section 553 of the APA.

### Count One – OSM Violation of NEPA

59.     OSM ignored available evidence concerning the adverse environmental impacts of activities authorized under the Stream Buffer Zone Rule, in violation of 42 U.S.C. § 4332.

60.     OSM failed to consider or otherwise address the cumulative impacts of the rule, in violation of 42 U.S.C. § 4332(2)(C)(1).

61.     OSM overstated the benefits of the rule, in violation of 42 U.S.C. § 4332.

62.     OSM failed to consider available alternatives and their environmental impacts and benefits, as required by 42 U.S.C. § 4332.

### Count Two – OSM Violation of the APA and SMCRA

63.     In violation of 5 U.S.C. § 706, OSM failed to provide a reasoned explanation or evidentiary basis for its reversal of the agency's prior interpretation of the 1983 Stream Buffer Zone Rule; failed to provide a reasoned explanation or evidentiary basis for refusing to consider or adopt available alternatives, and offered an irrational and arbitrary explanation for its decision that runs counter to the evidence before the agency.

64.     OSM's decision to promulgate the Stream Buffer Zone Rule is not in accordance with the environmental protection standards OSM is charged with enforcing under SMCRA,

including: 30 U.S.C. §§ 1201(c)-(e),(j); § 1202(a); § 1265(b)(10), (b)(22), (b)(24), (c)(4), as well as SMCRA implementing regulations set forth at 30 C.F.R. Part 800.

### Count Three – EPA Violation of APA

65.     EPA failed to provide public notice and opportunity to review and comment on its Stream Buffer Zone rule concurrence determination, in violation of 5 U.S.C. § 553.

66.     EPA's concurrence in the Stream Buffer Zone rule reverses the agency's prior interpretation of the 1983 Stream Buffer Zone Rule, without providing a reasoned explanation or evidentiary basis, in violation of 5 U.S.C. § 706.

### Count Four – EPA Violation of the CWA

67.     EPA's concurrence in the Stream Buffer Zone Rule violated its responsibility to ensure consistency and prevent risks of conflict between federal mining regulations, water quality standards, and other requirements promulgated under the CWA, 33 U.S.C. § 1311, § 1312, § 1313, 1316, 1317, and to enforce the overarching antidegradation, restoration, and maintenance requirements of 33 U.S.C. § 1251.

### REQUEST FOR RELIEF

THEREFORE, Plaintiffs respectfully request that this Court::

(1)     Declare that the Final EIS for the SBZ Rule violates NEPA, 42 U.S.C. § 4332;

(2)     Declare that the SBZ Rule is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706, and SMCRA, 30 U.S.C. § 1265;

(3)     Declare that EPA's concurrence in the SBZ Rule violated the CWA, 33 U.S.C. § 1251 *et seq.*, and APA, 5 U.S.C. §§ 553 and 706;

(4)     Vacate the SBZ Rule;

(5)     Vacate EPA's concurrence in the SBZ Rule;

(6)     Retain jurisdiction of this action to ensure compliance with the Court's decree;

(7)     Award Plaintiffs the costs of this action, including attorney's fees, under 28

U.S.C. § 2412(d);

(8)     Grant such other relief as the Court deems just and proper.


Original Complaint dated: December 22, 2008.
Amended Complaint dated: July 2, 2013


 */s/ Jennifer C. Chavez*
Jennifer C. Chavez (D.C. Bar No. 493421)
Neil Gormley (D.C. Bar 1008462)
Earthjustice
1625 Massachusetts Av., NW, Suite 702
Washington, D.C.  20036


*/s/ with permission*
Joseph M. Lovett
Appalachian Citizens Law Center
P.O. Box 507
Lewisburg, WV 24901


*/s/ with permission*
Aaron Isherwood
85 Second Street, 2nd Floor
San Francisco, CA 94105


*/s/ with permission*
Steve Sanders
Mary Cromer
Appalachian Citizens Law Center
52 Broadway, Suite B
Whitesburg, KY 41858